# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 06-2202

———————

Walnut Grove Partners, L.P., and    *
Urban Development Corp.,    *
   *
   *
Appellants,    *
   *   Appeal from the United States
v.    *   District Court for the
   *   Southern District of Iowa.
American Family Mutual    *
Insurance Co.,    *
   *
Appellee.    *

———————

Submitted: November 17, 2006
Filed: March 16, 2007

———————

Before MURPHY, ARNOLD, and BENTON Circuit Judges.

———————

BENTON, Circuit Judge.

Walnut Grove Partners, L.P., and Urban Development Corp. (collectively Walnut Grove) sued American Family Mutual Insurance Co., for a declaratory judgment, claiming breach of contract, statutory bad faith, and breach of implied-in-law duty of good faith. The district court[1] granted summary judgment to American

———————

[1]The Honorable Ronald L. Longstaff, Chief Judge, United States District Court for the Southern District of Iowa.

Family. Walnut Grove appeals. Having jurisdiction under 12 U.S.C. § 1291, this court affirms.

I.

Walnut Grove bought commercial liability insurance from American Family for its property in West Des Moines. Walnut Grove leased space in the property to a tenant, a law firm.

After multiple water infiltrations over several years, mold developed in the leased space. In January 2002, the tenant wrote Walnut Grove about mold and employee illness. Walnut Grove asserts this was a negotiation technique or request for rent abatement, and took no action about the mold. In May, the tenant hired a mold specialist and notified Walnut Grove: "In view of the new mold found in the stairway area to the main level, the preliminary [mold] test results ..., and the continuing health problems our personnel have been experiencing, we are giving you notice of our right to cancel and terminate the lease." The tenant also stated that tests showed levels of toxic mold 60 percent greater than outside air, but if acceptable mold remediation occurred, the tenant might continue the lease. Walnut Grove told American Family about the mold. In June, the tenant began extensive remediation. In July, after a 60-day notice period, the tenant informed Walnut Grove that the premises were untenantable, and terminated the lease. In August, Walnut Grove made its first claim of loss to American Family.

In October 2002, the tenant sued Walnut Grove in Iowa state court, seeking a declaratory judgment. Later, the petition was amended to include money damages in declaratory judgment, breach of contract, unjust enrichment, and breach of covenant of good faith and fair dealing. Walnut Grove requested American Family meet its duties of defense and indemnity. American Family concluded that the claims were not covered by the policy, and that it had no duty to defend.

After a bench trial, judgment was entered against Walnut Grove. The trial court determined that the tenant had expressed concerns about mold growth as early as August 21, 2001, and that Walnut Grove failed to identify and remediate mold in the leased space, even after observing it in October 2001. *Lamarca & Landry, P.C. v. Walnut Grove Partners, L.P.*, No. CL 90992 (Iowa D. Ct. Polk County September 3, 2003). The state court found that when Walnut Grove

> became aware in the fall of 2001 that there was mold in the conference room, it had an obligation to do more than replace carpet and furnace filters. It had an obligation to be certain that all of the necessary repair work was done. That necessarily included investigating the existence of mold behind the walls.

The court also stated that by January 2002, the leased space was untenantable "because by that time not only was the mold growth visible under the carpet in the conference room but the health impact of the mold had begun to manifest itself in the employees." *Id.*

Walnut Grove appealed. While the appeal was pending, Walnut Grove and the tenant settled.

In the present case, Walnut Grove asserts that American Family, by the policy, had a duty to defend and indemnify the state suit brought by the tenant. Both Walnut Grove and American Family moved for summary judgment. The district court granted partial summary judgment to American Family, finding the policy's impaired-property exclusion applied. After further discovery, American Family again moved for summary judgment. The district court granted judgment, finding no reasonable jury could conclude the mold damage was an accident, or occurrence, as required for coverage under the insurance policy. Walnut Grove appeals both summary judgments.

II.

This court reviews the grant of summary judgment *de novo*, applying the same standard as the district court and viewing the record most favorably to the nonmoving party. *Herring v. Canada Life Assurance Co.*, 207 F.3d 1026, 1029 (8th Cir. 2000). "Summary judgment is appropriate when no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law. . . . [I]f the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir. 1996); *Fed. R. Civ. P. 56.*

Walnut Grove claims the district court did not view the facts in a light most favorable to it, the nonmoving party. The court, however, followed the appropriate standard. *Fed. R. Civ. P. 56; see Heisler v. Metro. Council*, 339 F.3d 622, 627 (8th Cir. 2003) ("Although a district court reviewing a summary judgment motion is to assess the evidence in the light most favorable to the nonmoving party, that does not mean that the district court must ignore other evidence").

"State law governs the interpretation of insurance policies." *Nat'l U. Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc.*, 346 F.3d 1160, 1164 (8th Cir. 2003). "Because insurance policies are in the nature of adhesive contracts, we construe their provisions in a light most favorable to the insured." *Krause v. Krause*, 589 N.W.2d 721, 726 (Iowa 1999) *quoting A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 619 (Iowa 1991). In determining coverage, the court looks first "to the insuring agreement. If there is coverage, we look next to the exclusions. Last, if any exclusions apply, we then consider whether . . . [there] is an exception to the exclusion." *Pursell Constr., Inc. v. Hawkeye-Sec. Ins. Co.*, 596 N.W.2d 67, 69 (Iowa 1999). Here, analysis at the first step is dispostitive because there is no coverage under the policy. *Id.*

-4-

In this case, coverage requires that an injury or damage to others is an "occurrence." Walnut Grove contends that the development of mold and mold spores is an occurrence under the policy. Walnut Grove asserts the district court erred in finding that no reasonable jury could conclude the mold damage was an accident, or occurrence.

The policy states:

SECTION II – BUSINESS LIABILITY AND MEDICAL PAYMENTS INSURANCE

This section of the policy protects you and your business against claims that result from injury to others, or damage to other's property. . . .

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.     Insuring Agreement. We will pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies. We will have the right and duty to defend any suit seeking those damages. . . . But:

. . .

c.     The bodily injury or property damage must arise from an occurrence . . . .

The policy defines: "Occurrence means *an accident*, including continuous or repeated exposure to substantially the same general harmful conditions." (emphasis added). Under Iowa law, this language is unambiguous and dispositive.

The Iowa Supreme Court has

concluded that when "accident" is used in the definition of an "occurrence," but left undefined in the policy, the ordinary meaning to be given the term is "an *undesigned, sudden, and unexpected* event usually of an afflictive or unfortunate character and often accompanied by a manifestation of force. . . . [The term] clearly implies a misfortune with concomitant damage to a victim, not the negligence which eventually results in that misfortune."

*Norwalk Ready Mixed Concrete, Inc. v. Travelers Ins. Co.*, 246 F.3d 1132, 1136-37 (8th Cir. 2001), *quoting* **Pursell Constr., Inc. v. Hawkeye-Security Ins. Co.**, 596 N.W.2d 67, 71 (Iowa 1999) (alteration in original) (emphasis added).

Timothy John Urban, president of Urban Development Corp. (the general partner of Walnut Grove), submitted an affidavit to the district court in support of its motion for summary judgment. He averred that Walnut Grove notified American Family of an alleged loss in August 2002, arising from the tenant's complaint that the leased space was untenantable due to exposure to toxic mold.

During the state trial, Urban testified that mold is a legitimate concern of a tenant in a space with a history of water infiltration. He knows that water infiltrating a building can cause mold to grow in places that are not open to the naked eye, or immediately visible, and that mold growing in these places can cause a tenant to suffer from environmental affects of the mold.

More directly, Urban testified:

Q.     By at least January of 2002, you had become aware that [the tenants] were concerned there was mold growing in their leased premises; correct?

A.     Yes.

-6-

Q.    And you were also made aware, at least by ... January of 2002, that [the tenant] was claiming that their employees were getting sick in the leased premises; weren't you?

A.    Yes.

Q.    At that point in time you could have had the premises tested or inspected for mold; couldn't you?

A.    Yes, we could have.

. . .

Q.    And at that time you could have hired somebody to go in and remediate whatever mold was there; correct?

A.    We could have.

Q.    And again you chose not to?

A.    Right.

Contrary to this uncontroverted testimony, Walnut Grove says in its brief: "There was no evidence in the record that there was any mold in existence prior to January 2002 or even subsequent to January 2002 until April 2002." They also state: "When the water intrusion occurred in April of 2002, there was a sudden and accidental physical injury which resulted in mold."

During oral argument before this court, however, Walnut Grove acknowledged that mold began developing in 2001.[2] At oral argument, when asked if the occurrence occurred in April 2002, Walnut Grove said "No," continuing: "The occurrence

---

[2]Walnut Grove contends there is a legal difference between mold and toxic mold. Because it did not test or remediate when notified – which would have at least determined the type of mold, or its effects – this attempted distinction fails.

happens when the mold develops." When queried as to when mold developed, Walnut Grove stated: "We do know that the water infiltrations substantially ended in October 2001 and that the mold had developed sometime prior to that." When asked if there was water infiltration in April 2002, Walnut Grove responded: "There was water infiltration in April 2002, and we're not arguing that the mold, if there was any mold, that developed after the April 2002, was covered. What we're talking about is the *mold that developed from the 2001 intrusions because that appears to be the mold that caused the damage to the third parties.* And that appears to be the case viewing the facts in the light most favorable to the plaintiff . . . ." (emphasis added).

Thus, before October 2001 or January 2002, Walnut Grove was on notice of mold in the leased space. It undertook no investigation or remediation. The tenant began extensive remediation in June 2002, terminating the lease in July. Viewing the facts most favorably to Walnut Grove, at least six months elapsed between notice of mold and the date of alleged loss. Therefore, the mold in this case does not constitute "an undesigned, sudden, and unexpected event" as required by the policy. ***Norwalk,*** 246 F.3d at 1136-37. *See **City of Carter Lake v. Aetna Cas. & Sur. Co.***, 604 F.2d 1052, 1055 (8th Cir. 1979) (Five months between first notice to the insured and second loss to third party not covered by insurance policy). *See also **Dico, Inc. v. Employers Ins. of Wausau,*** 581 N.W.2d 607, 613-12 (Iowa 1998) *quoting **Iowa Comprehensive Pertroleum Underground Storage Tank Fund Bd. v. Farmland Mut. Ins. Co.***, 568 N.W.2d 815, 818 (Iowa 1997) ("While ... first drop of leakage might be sudden, . . . contamination occurring over a period of time falls outside the definition of 'accident'"); ***Modern Equip. Co. v. Cont'l W. Ins. Co., Inc.***, 355 F.3d 1125, 1129 (8th Cir. 2004) ("[T]he purpose of a commercial general liability policy . . . is to provide coverage for tort liability for physical damage to others, and not to insulate an insured from economic losses flowing from breach of its contractual duties").

Walnut Grove objects to summary judgment because it did not *intend* for mold to develop. Walnut Grove claims, "American Family would need to prove in its motion for summary judgment, to such a degree that reasonable people could not differ, that Mr. Urban and those who act for [Walnut Grove] both intended the water to come in and the mold to develop and the mold to cause injury or untenantability to [tenant] and its tenants and employees." Walnut Grove cites an inapposite case, with a different coverage clause. *See First Newton Nat'l Bank v. Gen. Cas. Co. of Wis.*, 426 N.W.2d 618, 624-25 (Iowa 1988). Unlike the policy in *First Newton*, the present policy does not define an occurrence to include the absence of intent. *Id. See Pursell*, 596 N.W.2d at 71 (analyzing clause identical to present policy). The Iowa Supreme Court has interpreted the exact clause at issue here without mentioning intent. *Pursell,* 596 N.W.2d at 71. The term "accident" within the definition of an "occurrence" is "an undesigned, sudden, and unexpected event . . . not the negligence which eventually results in that misfortune." *Id.*, *quoting Cent. Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 448 (Iowa 1970).[3]

Walnut Grove further attacks the district court's judgment, stating it applied an incorrect standard, reasonable forseeability, to interpret the term "unexpected." In fact, neither the court nor the parties refer to reasonable forseeability in the summary judgment record. The district court states: "Under Iowa law, in order for an event to constitute an accident, and consequently, an occurrence, an event must be *unexpected*," citing the Iowa Supreme Court case relied on by Walnut Grove. *See Weber v. IMT Ins. Co.*, 462 N.W.2d 283, 287 (Iowa 1990). Walnut Grove also asserts error in the district court's citation, as additional authority, to *Estate of Wade v. Continental Insurance Co.*, 514 F.2d 304, 306-07 (8th Cir. 1975). This assertion fails because the court applied the correct standard and because the Iowa Supreme

---

[3]Walnut Grove cites *Weber* for the proposition that an "accident" required an "unintended event." In *Weber*, the clause in the policy – a "sudden and accidental" clause – is different than the one at issue here.

Court in *Weber* used the exact citation and parenthetical as the district court here.  *See Walnut Grove Partners, L.P. v. Am. Family Mut. Ins. Co.*, No.04-cv-10168, slip op. at 5 (S.D. Iowa October 4, 2004); *Weber*, 462 N.W.2d at 287, *citing Wade*, 515 F.2d at 306-07.

Additionally, the word "expected denotes that the actor knew or should have known that there was a substantial probability that certain consequences will result from his actions."  *Weber*, 462 N.W.2d at 287, *quoting Carter Lake*, 604 F.2d at 1058-59.  Substantial probability requires more than reasonable foreseeability.  "The indications must be strong enough to alert a reasonably prudent man not only to the possibility of the results occurring but the indications also must be sufficient to forewarn him that the results are highly likely to occur."  *Carter Lake*, 604 F.2d at 1059 n.4; *Weber*, 462 N.W.2d at 287.

Walnut Grove says: "The reasoning of the *Carter Lake* case should control the outcome in the case now before the court . . . ."  In *Carter Lake*, sewage repeatedly backed-up into the basement of a private home due to the failure of city equipment. The city, as the insured, sought coverage for clean-up of the basement.  This court, under Iowa law, found: "Once the city was alerted to the problem, its cause, and the likelihood of reoccurrence, it could not ignore the problem and then look to [the insurance company] to reimburse it for liability incurred by reason of such inaction." *Carter Lake*, 604 F.2d at 1059.

At oral argument, Walnut Grove posited: "In the *Carter Lake* case, the court said after the first discovery of the sewage back-up – then nothing else after that is covered.  Here, after the first discovery of mold which was in April 2001, then no further discoveries of mold should be covered, and that would be the appropriate application of the *Carter Lake* case."  In this case, the record is uncontroverted; Walnut Grove knew of multiple water infiltrations that occurred over years.  It did not remediate the mold problem, which made the space untenatable.  In its brief to this

court, Walnut Grove claims the occurrence is the mold which resulted from a water intrusion in April 2002. According to the undisputed testimony, however, at least by January 2002, Walnut Grove was on notice of mold in the leased space. The mold in 2002, therefore, was not unexpected. No question of material fact remains. American Family is entitled to judgment as a matter of law.

The judgment of the district court is affirmed.

_____