# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1933/10-2065

_____

Liberty Mutual Insurance Company,    *
                                           *

       Appellant/Cross-Appellee,    *

                                           *    Appeals from the United States

    v.                                   *    District Court for the

                                           *    Southern District of Iowa.

Pella Corporation; Pella Windows    *
and Doors, Inc.,                         *

                                           *

       Appellees/Cross-Appellants.    *

_____

Submitted: February 15, 2011
Filed: August 18, 2011

_____

Before SMITH, GRUENDER, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Liberty Mutual Insurance Company ("Liberty Mutual") sued Pella Corporation and Pella Windows and Doors, Inc. (collectively, "Pella") in the district court for declaratory judgment. The suit sought to determine the scope of Liberty Mutual's obligation, under general commercial liability (GCL) policies (collectively, "Policies") issued to Pella, to reimburse Pella's defense costs in two underlying lawsuits. Liberty Mutual appeals the district court's entry of summary judgments in favor of Pella. The court concluded that Liberty Mutual owed Pella a duty to reimburse Pella's defense costs in the pending litigation.

In addition, Pella cross-appeals the district court's entry of summary judgment on its counterclaim for a bad-faith denial of coverage. Pella also challenges the court's calculation of the amount of defense costs Pella could recover under the Policies. For the reasons set forth below, we affirm in part, reverse in part, and remand with instructions to enter declaratory judgment in favor of Liberty Mutual.

## I. *Background*

The present coverage dispute concerns Pella's right to coverage under the Policies for claims asserted against Pella in two class-action lawsuits in Illinois state and federal courts. In each case, the plaintiffs alleged that Pella sold them defective windows that allowed water to leak through the windows' aluminum cladding. During the times relevant to those class actions, Pella was insured under policies issued by several different insurance carriers. Pella did not, however, have any other insurance in effect at the same time as its Policies with Liberty Mutual (September 1, 2000 to September 1, 2006). In response to the two underlying lawsuits, these other insurers agreed to pay a share of Pella's defense costs in the two class actions.

### A. *The* Pappas *Suit*

The first class action, *Pappas v. Pella Corporation and Pella Windows & Doors*, No. 02-L-14558 ("*Pappas* Suit"), was filed in 2002 in the Circuit Court of Cook County, Illinois. The initial complaint alleged that Pella defectively designed and manufactured windows that the Pappas family purchased and that the defect caused damage to their windows and their home. The complaint alleged a breach of the implied warranty of merchantability, a breach of the implied warranty of fitness for a particular purpose, and strict liability. The *Pappas* plaintiffs subsequently filed an "Amended Class Action Complaint," seeking class certification and alleging counts of negligence and strict liability. The *Pappas* plaintiffs amended their complaint three more times in the next several years.

In 2004, Pella entered into a confidential agreement with Liberty Mutual and its pre-2001 insurance carriers ("*Pappas* Agreement"), in which each insurance carrier agreed to pay a share of Pella's past and future defense costs for the *Pappas* suit, subject to a complete reservation of rights.

Subsequently, in 2007, the plaintiffs filed their most recent complaint, the "Fourth Amended Class Action Complaint." This complaint continued to allege that Pella's windows were defectively designed and manufactured, allowing water to enter and remain behind the windows' aluminum cladding, resulting in "premature wood rot and deterioration" that "caus[ed] damage." The complaint alleged that Pella knew about the defective windows but willfully, "with knowledge and/or intent to deceive," concealed, suppressed, or omitted this material fact from purchasers of its windows. As a result, the complaint alleged only one count: a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Illinois Compiled Statutes 505/1 et seq. In its prayer for relief, the plaintiffs requested, among other things, damages "sufficient to remediate and repair damage to Plaintiffs' and class members' homes which resulted from water intrusion."

### B. *The* Saltzman *Suit*

The second suit, *Saltzman, et al. v. Pella Corp. and Pella Windows & Doors, Inc.*, No. 06-C-4481 ("*Saltzman* Suit"), was filed in 2006 in the United States District Court for the Northern District of Illinois. The plaintiffs' amended complaint alleged that Pella's "aluminum-clad windows contain a latent defect that allows water to penetrate and leak behind the aluminum cladding, resulting in premature wood rot and other physical damage to both the window and main structure." In addition, the plaintiffs alleged that "Pella was aware that its windows contained an inherent defect that permitted leakage" but had concealed this defect from the plaintiffs. These allegations formed the basis for all six claims in the amended *Saltzman* complaint: (1) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Illinois Compiled Statutes 505/1 et seq., and "substantially similar laws of certain

other states"; (2) violation of "similar uniform deceptive trade practices acts"; (3) common law fraud by omission; (4) breach of the implied warranty of merchantability; (5) unjust enrichment; and (6) declaratory relief.

In 2008, Pella entered into a confidential agreement with its pre-2001 insurance carriers ("*Saltzman* Agreement"), in which the insurance carriers agreed to pay a share of Pella's defense costs for the *Saltzman* Suit, again subject to a complete reservation of rights. Liberty Mutual was not a party to the *Saltzman* Agreement.

## C. *The Policies*

Liberty Mutual and Pella entered into a series of GCL policies, effective from September 1, 2000, through September 1, 2006. The Policies are expressly labeled as providing "Excess General Commercial Liability Coverage." Section I.A provides coverage for "excess bodily injury and property damage liability" as follows:

> a. We will pay those sums in excess of the "Self-Insured Amount" that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this excess insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for in SECTION V—SUPPLEMENTARY PAYMENTS/ALLOCATED LOSS ADJUSTMENT EXPENSE. . . . The "bodily injury" or "property damage" must be caused by an "occurrence". . . . The amount we will pay for damages is limited as described in SECTION IV—LIMITS OF INSURANCE.
>
> b. We WILL NOT have the duty to defend or investigate any claim or "suit" seeking damages to which this policy may apply.

Section V of the Policies includes one of two versions of an endorsement labeled "SUPPLEMENTARY PAYMENTS/ALLOCATED LOSS ADJUSTMENT EXPENSE" ("ALAE Endorsement"). The ALAE Endorsement provides that Liberty

Mutual would reimburse Pella for certain expenses incurred in defending lawsuits that the Policies covered. The ALAE Endorsement in the 2000–2005 versions of the Policies states:

1.  "Allocated Loss Adjustment Expenses" paid by the insured will reduce the "self-insured amount";

2.  For each "occurrence" we will reimburse the insured for "Allocated Loss Adjustment Expense" paid by or on behalf of the insured in excess of the "self-insured amount". Our obligation to reimburse the insured is limited as set forth in the SECTION II—DEFENSE, SETTLEMENT AND INVESTIGATION OF CLAIMS, paragraphs (5) and (6).

The ALAE Endorsement for the 2005–2006 policy uses slightly different language, stating:

1.  For each "occurrence", "Allocated Loss Adjustment Expenses" paid by the insured will reduce the "self-insured amount".

2.  Where the insured controls the defense, we will reimburse the insured for "Allocated Loss Adjustment Expense" incurred by the insured for any "occurrence" after the "Self-insured Amount" has been exhausted by the payment of damages and/or "Allocated Loss Adjustment Expense" by the insured for that "occurrence" . . . .

In Section VI, the Policies state that "[i]nsurance provided under this policy, including all endorsements thereto, is excess over the 'Self-insured Amount'." Finally, in Section VII, the Policies contain the following definitions relevant to the present coverage dispute:

-5-

2.    "Allocated Loss Adjustment Expense" includes but is not limited to:

      (a)    reasonable attorneys' fees for claims in suit (reasonable attorneys' fees means rates which are actually paid by us to attorneys retained in the ordinary course of business in the defense of similar actions in the community where the claim is being defended)[.]

                              * * *

10.   "Occurrence" means:

      (a)    an accident, including continuous or repeated exposure to substantially the same general harmful conditions[.]

                              * * *

11.   "Other Insurance" means any other valid and collectible insurance, whether primary, excess, contingent or on any other basis, except any such insurance purchased by the insured specifically to apply in excess of this insurance.

                              * * *

15.   "Self-insured Amount" means:

      (a)    If the insured has no "other insurance" or has "other insurance" less than the "Self-insured Amount":

             (1)    With respect to damages which this policy (including any endorsements(s) thereto) applies on an each "occurrence" basis:

                    As to each "occurrence", the amount shown in the Declarations under Item 4, Self-Insured Amount.

                              * * *

      (b)    If the insured has "other insurance" greater than or equal to the "Self-insured Amount":

All amounts payable or retained under such "other insurance": but not less than the amount shown in the Declarations under Item 4, Self-Insured Amount[.]

16. "Suit" means "a civil proceeding in which damages because of . . . 'property damage' . . . to which this insurance applies are alleged."

## D. *Instant Litigation*

Liberty Mutual filed this action in the district court in 2007 seeking a declaration that it owed no coverage to Pella under the Policies in the *Pappas* and *Saltzman* Suits. Pella counterclaimed, seeking a declaration that Liberty Mutual did owe coverage for those suits. Thereafter, both Liberty Mutual and Pella filed cross-motions for partial summary judgment to determine the scope of Liberty Mutual's duty to reimburse defense costs under the Policies. In addition, in January 2009, both parties filed additional cross-motions for partial summary judgment to determine whether the Policies covered the claims in the *Pappas* and *Saltzman* Suits.

The district court first ruled on the parties' motions for summary judgment regarding the scope of coverage under the Policies. First, the court rejected Liberty Mutual's argument that its duty to reimburse Pella's defense costs requires that an actual "occurrence" be established. Instead, the court held "that Liberty Mutual has a contemporaneous duty to reimburse Pella's 'Allocated Loss Adjustment Expense' in excess of the 'Self-insured Amount,' so long as the Underlying Lawsuits contain allegations that potentially bring the action within the policy coverage." Second, the court rejected Liberty Mutual's argument that its duty to reimburse defense costs would arise after Pella had incurred defense costs exceeding all the amounts payable from Pella's other (pre-2001) insurance providers.

The district court's next ruling addressed whether Liberty Mutual owed Pella a duty to reimburse defense costs in the *Pappas* and *Saltzman* Suits. The court first

concluded that the plaintiffs in the *Pappas* Suit alleged covered "property damage" and not simply damage to the windows themselves, which would be excluded by the Policies. Additionally, the court concluded that the plaintiffs in both the *Pappas* and *Saltzman* Suits had alleged an "occurrence." Specifically, the court determined that although the plaintiffs' Illinois Consumer Fraud Act claims alleged that Pella knowingly concealed or omitted a latent defect in its windows, "it is not clear they allege that Pella 'knew or should have known that there was a substantial probability that certain consequences will result from [its] actions.'" As a result, the court concluded that the Illinois Consumer Fraud Act claims in the *Pappas* and *Saltzman* Suits contained allegations that arguably or potentially brought the action within the coverage of the Policies.

Before the court had ruled on the motions for summary judgment, Pella amended its counterclaim to add a claim of bad faith against Liberty Mutual based on its refusal to pay its defense costs in the *Pappas* and *Saltzman* Suits. After issuing the two decisions described above, the district court granted Liberty Mutual's motion for summary judgment on Pella's bad-faith claim. The court determined that although it had ruled against Liberty Mutual on the coverage issues, "[b]y any reasonable standard . . . these issues were (and are) 'fairly debatable' as a matter of law."

Finally, after ruling on all the motions for summary judgment, the district court entered an order determining the amount of defense costs (i.e., attorneys' fees) that Pella could recover from Liberty Mutual for the *Pappas* and *Saltzman* Suits. For the *Pappas* Suit, the court concluded that Liberty Mutual could only be held responsible for the costs allocated to it under the *Pappas* Agreement. For the *Saltzman* Suit, the court determined that the rates in the *Saltzman* Agreement—to which Liberty Mutual was not a party—nonetheless represented rates that Liberty Mutual would pay "in the defense of the same action and in the same community." Therefore, the court concluded that under the policy's definition of reasonable attorneys' fees, Pella could

not recover fees from Liberty Mutual at a higher rate than those set out in the *Saltzman* Agreement.

## II. *Discussion*
### A. *Liberty Mutual's Appeal*

In its appeal, Liberty Mutual argues that the district court erred in interpreting the scope of coverage under the Policies and determining that Liberty Mutual owed Pella a duty to reimburse Pella's defense costs in the *Pappas* and *Saltzman* Suits. Specifically, Liberty Mutual contends that the court erred in determining that the Policies (1) provide coverage only if the underlying suits *alleged* an "occurrence" and (2) did not provide coverage in excess of all other applicable insurance. Additionally, Liberty Mutual maintains that the court erroneously concluded that (1) the *Pappas* and *Saltzman* Suits alleged an "occurrence" and (2) the *Pappas* Suit alleged covered "property damage." We address each of these arguments in turn.

We review de novo the district court's grant of summary judgment. *Walnut Grove Partners, L.P. v. Am. Family Mut. Ins. Co.*, 479 F.3d 949, 951 (8th Cir. 2007). In doing so, we apply the same standard as the district court and view the record in the light most favorable to the nonmoving party. *Id.* Thus, "[s]ummary judgment is appropriate when no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law." *Id.* at 951–52 (quotation and citation omitted).

### 1. *Scope-of-Coverage Issues*
#### a. *Whether the Policies Require the Existence of an Established "Occurrence"*

Liberty Mutual first argues that the district court erred in defining the scope of its duty to reimburse Pella's defense costs under the Policies. Liberty Mutual asserts that the district court construed the Policies so as to create an "unqualified duty to reimburse defense costs," which Liberty Mutual describes as the functional equivalent of a duty to defend. The Policies, however, unambiguously disclaim such a duty to

defend. According to Liberty Mutual, interpreting the duty to reimburse in this way would render meaningless its disclaimer of a duty to defend.

Liberty Mutual maintains that the Policies instead unambiguously provide that it will "have a defense cost reimbursement obligation, which is to reimburse defense costs in excess of the '[s]elf-insured amounts' in the event it is established that there was an 'occurrence' . . . ." Liberty Mutual contends that the phrase "for each [or any] occurrence" can only refer to "an actual as opposed to an alleged occurrence." In other words, Liberty Mutual argues that the Policies clearly require that "there can be no reimbursement obligation unless and until the existence of an 'occurrence' has been established." Because, in its view, this is the only reasonable reading of the Policies, Liberty Mutual contends that the district court erred in finding that the Policies provide coverage for a suit that merely *alleges* an occurrence.

Pella responds that the district court correctly concluded that the Policies could be read to require a contemporaneous duty to reimburse defense costs when the underlying lawsuit alleges an "occurrence." According to Pella, the Policies (specifically the ALAE Endorsement) "set only one precondition to the payment of defense costs: the satisfaction of the ["Self-insured Amount"]." The reference to an "occurrence" in the ALAE Endorsement only means that Pella must satisfy the "Self-insured Amount" separately for each "occurrence"; that is, if there are multiple "occurrences," Pella must satisfy the "Self-insured Amount" for each. Pella contends that this interpretation of the Policies is especially clear in the 2005–2006 ALAE Endorsement, which provides that Liberty Mutual will reimburse defense costs "after the 'Self-insured Amount' has been exhausted." According to Pella, the plain language of the ALAE Endorsement does not require the additional condition that the "occurrence" be an established fact.

Pella urges that its reading of the ALAE Endorsement is consistent with the Policies as a whole. The ALAE Endorsement provides that Liberty Mutual will

-10-

reimburse Pella for "Allocated Loss Adjustment Expense," which the Policies define to include attorneys' fees "for claims in suit." In turn, the Policies define a "suit" as "a civil proceeding in which damages because of . . . property damages . . . are alleged." When read together, Pella argues, these provisions show that "[t]he payment of defense costs is directly tied to the allegations of the underlying action in question—not to the ultimate resolution of those allegations." Moreover, Pella maintains that this reading is consistent with the intended coverage of the Policies: if Pella was only entitled to reimbursement when the "occurrence" was established, it would not be able to receive reimbursement in many cases where it successfully defended itself in a suit alleging such an "occurrence." In addition, Pella argues that its interpretation is not inconsistent with Liberty Mutual's disclaimer of a duty to defend. Although Pella concedes that the duty to defend is distinct from the duty to reimburse defense costs, Pella maintains that courts have recognized that, "absent express language to the contrary . . . the duty to pay defense costs, like the duty to defend, is a contemporaneous one." Thus, Pella asserts that the Policies can consistently disclaim a duty to defend while creating a contemporaneous duty to reimburse defense costs.

"State law governs the interpretation of insurance policies." *Walnut Grove*, 479 F.3d at 952 (quotation and citation omitted). Neither party disputes that Iowa law applies to our interpretation of the Policies. Iowa law provides that "[t]he construction of an insurance contract and the interpretation of its language are matters of law for the court." *Pudil v. State Farm Mut. Auto. Ins. Co.*, 633 N.W.2d 809, 811 (Iowa 2001) (quotation and citation omitted).

Under Iowa law, the intent of the parties, as determined by the language of the policy, controls the court's interpretation of an insurance policy. *Nationwide Agri-Bus. Ins. Co. v. Goodwin*, 782 N.W.2d 465, 470 (Iowa 2010). Iowa courts will find an ambiguity in an insurance policy "[o]nly when the policy language is susceptible to two *reasonable* interpretations." *Id.* (quotation and citation omitted). In addition,

> [The Iowa Supreme Court] has held that "[a]n insurer assumes a duty to define any limitations or exclusionary clauses in clear and explicit terms." *Hornick v. Owners Ins. Co.*, 511 N.W.2d 370, 374 (Iowa 1993). "Thus, when an exclusionary provision is fairly susceptible to two reasonable constructions, the construction most favorable to the insured will be adopted." *Thomas* [*v. Progressive Cas. Ins. Co.*], 749 N.W.2d [678,] 682 [(Iowa 2008)]. "Nonetheless, if there is no ambiguity, the court 'will not "write a new contract of insurance"' for the parties." *Id.* (quoting *Stover v. State Farm Mut. Ins. Co.*, 189 N.W.2d 588, 591 (Iowa 1971)) (citation omitted). "If exclusionary language is not defined in the policy, we give the words their ordinary meaning." *Farm & City Ins. Co. v. Gilmore*, 539 N.W.2d 154, 157 (Iowa 1995). "An exclusion that is clear and unambiguous must be given effect." *Id.*

*Id.*

This case involves a duty to reimburse defense costs—not the duty to defend. Iowa state courts have not examined how, or to what extent, the duty to reimburse defense costs may differ from the duty to defend. *See Fed. Ins. Co. v. Sammons Fin. Grp., Inc.*, 595 F. Supp. 2d 962, 976 (S.D. Iowa 2009) (interpreting a policy under Iowa law and noting that "[t]he question of how to treat an insurer's duty to advance defense costs is one which few courts have had occasion to address"). This court, interpreting a policy under Iowa law, has noted that the duty to reimburse defense costs and the duty to defend are different but "similar in result." *See McCuen v. Am. Cas. Co. of Reading, Pa.*, 946 F.2d 1401, 1407 (8th Cir. 1991) (holding that a policy with similar language required the insurer to pay defense costs as the insured incurred them because the policy did not unambiguously state otherwise). Moreover, other "state courts generally have viewed an insurer's duty to advance defense costs as an obligation congruent to the insurer's duty to defend, concluding that the duty arises if the allegations in the complaint could, if proven, give rise to a duty to indemnify." *Fed. Ins. Co.*, 595 F. Supp. 2d at 976 (citing *Acacia Research Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 05-501, 2008 WL 4179206, at *11 (C.D. Cal.

Feb. 8, 2008); *Hurley v. Columbia Cas. Co.*, 976 F. Supp. 268, 275 (D. Del. 1997); *Am. Chem. Soc. v. Leadscope, Inc.*, No. 04AP-305, 2005 WL 1220746, at *4–8 (Ohio Ct. App. May 24, 2005)).

Therefore, even though this case does not involve a duty to defend, the parameters of that duty, under Iowa law, nevertheless guide our analysis of Liberty Mutual's duty to reimburse Pella's defense costs. The Iowa Supreme Court has explained that "the *duty to defend* rests *solely* on whether the petition contains any allegations that *arguably* or *potentially* bring the action within the policy coverage." *Emp'rs Mut. Cas. Co. v. Cedar Rapids Television Co.*, 552 N.W.2d 639, 641 (Iowa 1996) (quotation and citation omitted). In other words, we must look to the facts alleged in the complaint to determine whether coverage exists for that suit. *Id.*

Here, while the Policies explicitly disclaim a duty to defend any claim, the Policies do provide for the reimbursement of some defense costs. Liberty Mutual's duty to reimburse defense costs is defined two different ways in the different versions of the Policies. As noted *supra*, in the 2000–2005 version, the duty is phrased as follows:

> For each "occurrence" we will reimburse the insured for "Allocated Loss Adjustment Expense" paid by or on behalf of the insured in excess of the "self-insured amount".

The duty is phrased slightly differently in the 2005–2006 policy:

> [W]e will reimburse the insured for "Allocated Loss Adjustment Expense" incurred by the insured for any "occurrence" *after the "Self-insured Amount" has been exhausted* by the payment of damages and/or "Allocated Loss Adjustment Expense" by the insured for that "occurrence" . . . .

(Emphasis added.) Liberty Mutual contends that, in both policy versions, the duty is unambiguously conditioned upon the established fact—not the mere allegation—of an "occurrence."

The plain language of the policy does not compel Liberty Mutual's interpretation. To begin with, the Policies do not explicitly condition reimbursement of any defense costs on the establishment of an "occurrence." Instead, the Policies only condition reimbursement on Pella's having "paid" or "incurred" the requisite amount of "Allocated Loss Adjustment Expense." Moreover, the 2005–2006 version of the Policies states that Liberty Mutual will reimburse Pella for its defense costs "for any 'occurrence' *after* the 'Self-insured Amount' has been exhausted." (Emphasis added.) This language suggests that Liberty Mutual will begin to reimburse Pella as soon as it has paid defense costs equal to the "Self-insured Amount." Pella could well reach this threshold prior to any determination of whether an "occurrence" had been established by the facts of the case.[1]

Similarly, nothing else in the Policies indicates that the duty to reimburse would be triggered at the conclusion of the suit—or, at least, at the point when the existence of an "occurrence" could be established. The Policies provide for reimbursement of "Allocated Loss Adjustment Expense," which the Policies define, in part, as "reasonable attorneys' fees for *claims in suit*." (Emphasis added.) A "suit" is defined as "a civil proceeding in which damages because of . . . 'property damage' . . . to which this insurance applies are *alleged*." (Emphasis added.) Thus, read together, the

---

[1]At oral argument, counsel for Liberty Mutual insisted that the question of whether an "occurrence" was "established" could be resolved without a final judgment by a court. Nevertheless, he could not satisfactorily identify an earlier point in the litigation when this determination might be made.

Policies provide that Liberty Mutual will reimburse Pella's attorneys' fees for claims in a suit in which covered "property damage" is *alleged*.[2]

Pella interprets the Policies as requiring Liberty Mutual to reimburse defense costs as soon as the "Self-insured Amount" is satisfied for each alleged occurrence. The language and structure of the Policies do not expressly foreclose this interpretation. Given the requirement that insurers state any exclusions or limitations on coverage "in clear and explicit terms," *Nationwide*, 782 N.W.2d at 470 (quotation and citation omitted), Pella's interpretation is, at least, a reasonable alternative. Consequently, if Liberty Mutual's interpretation is also reasonable, there is, by definition, an ambiguity that must be resolved in Pella's favor. *See id.*

Liberty Mutual asserts that Pella's interpretation is unreasonable because it would give rise to a duty to reimburse that is the functional equivalent of a duty to defend, which the Policies explicitly disclaim. In making this argument, Liberty Mutual relies on *Steyer v. Westvaco Corp.*, 450 F. Supp. 384 (D. Md. 1978), in which that court rejected the insured's interpretation of a duty to reimburse, wherein "the insurance company would be liable for defense costs whenever property damage is alleged, but not found," *id.* at 396. The court rejected this interpretation because "such a construction would amount to a duty to defend even though that duty is expressly disclaimed by the policy." *Id. Steyer*, however, involved the duty to reimburse defense costs in the context of an *indemnity* policy, which explicitly provided coverage only after the fact of liability had been established. *Id.* at 395 n.11; *cf. McCuen*, 946 F.2d at 1406–07 (explaining the difference between liability coverage and indemnity coverage). Liberty Mutual has not argued that the Policies provide only indemnity coverage; thus, *Steyer* is not directly on point.

---

[2]The definition of an "Occurrence" does not aid Liberty Mutual's interpretation, either. The term is merely defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Pella's interpretation of the Policies does not nullify the Policies' disclaimer of the duty to defend. The duty to defend necessarily requires the insurer to pay defense costs, but it also requires the insurer to conduct and take control of the whole defense. *See Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 32–33 (Iowa 1982) (discussing the scope of the insurer's obligations under a duty to defend). Contrary to Liberty Mutual's assertion, Liberty Mutual would still have no duty to defend even if it has to reimburse defense costs in a suit where an "occurrence" is alleged but not yet an established fact. Accordingly, the district court did not err in concluding that Liberty Mutual's duty to reimburse Pella's defense costs should be determined by looking at the allegations in the complaint to determine if they state a covered claim.

b. *Whether the Policies Provide Coverage in Excess of All Other Insurance*

Liberty Mutual next argues that the district court erred in finding that Liberty Mutual's coverage under the Policies was not excess over Pella's other, pre-2001 insurance. The plain language of the Policies, Liberty Mutual contends, "explicitly and unambiguously" states that Liberty Mutual does not have to reimburse Pella's defense costs if those defense costs are fully covered by other insurers. Thus, Liberty Mutual maintains that the Policies were clearly intended to serve as excess policies because they are labeled as such. According to Liberty Mutual, by considering only whether the Policies were "true excess" policies (and concluding that they were not), the district court "simply removed key language from the policy."

Here, the Policies provide that Liberty Mutual will reimburse Pella's defense costs that are in excess of the "Self-insured Amount." The Policies defined the "Self-insured Amount" as follows:

"Self-insured Amount" means:

* * *

(b)    If the insured *has* "other insurance" greater than or equal to the "Self-insured Amount":

-16-

> *All amounts payable or retained under such "other insurance"*: but not less than the amount shown in the Declarations under Item 4, Self-Insured Amount[.]

(Emphases added.) In turn, the Policies define "other insurance" as "*any other valid and collectible insurance*, whether primary, excess, contingent or on any other basis, except any such insurance purchased by the insured specifically to apply in excess of this insurance." (Emphasis added.) At first glance, the Policies' language suggests that Liberty Mutual owes a duty to reimburse only in excess of all amounts that Pella can recover under any other applicable insurance policies. Upon closer examination, however, the Policies' use of the present tense is significant: the "Self-insured Amount" could reasonably be read to provide excess coverage only over the insurance that Pella had in effect at the same time as the Policies. At the time the Policies were in effect—September 1, 2000, to September 1, 2006—Pella did *not* "ha[ve]" *any* "other insurance." Under this reading, the district court did not err by concluding that Pella did not have to exhaust its coverage from its pre-2001 insurers before being reimbursed by Liberty Mutual.

This interpretation finds additional support from Iowa courts' interpretation of "other insurance." Iowa courts do not always interpret a policy's reference to "other insurance" to mean that its coverage will be construed as excess over other such insurance. *See Nat'l Sur. Corp. v. Ranger Ins. Co.*, 260 F.3d 881, 884–85 (8th Cir. 2001) (discussing Iowa courts' interpretations of "other-insurance clauses"). Otherwise, for example, an insured could be covered by two policies, which both contain "other insurance" provisions; if those provisions were construed literally, "the insured might have no coverage, an obviously unacceptable answer." *Id.* at 884. (citing *Union Ins. Co. v. Iowa Hardware Mut. Ins. Co.*, 175 N.W.2d 413, 417 (Iowa 1970)).

-17-

Instead, Iowa courts distinguish between primary policies which contain "other insurance" provisions and "true excess" policies. A primary policy with an "other insurance" provision is "a policy purchased to be the first tier of insurance coverage, one which is intended to kick in the moment liability is established, but which may be excess in certain, specified situations." *LeMars Mut. Ins. Co. v. Farm & City Ins. Co.*, 494 N.W.2d 216, 218 (Iowa 1992) (quotation and citation omitted). In those circumstances, the primary insurer may be entitled to contribution from other insurers; the insured's right to coverage, however, will not be affected. 15 Lee R. Russ & Thomas F. Segala, *Couch on Insurance* § 219:1, at 219-8 (3d ed. 1999). In contrast, a "true excess," or "umbrella" policy, is "a policy purchased to be the final tier of insurance coverage, one which is intended to be excess over all other available insurance" and "which the parties intended to cover only catastrophic losses which exceed the insured's required primary insurance limit." *LeMars*, 494 N.W.2d at 218 (quotation and citation omitted). "[A]n insurer that issued a 'true excess' or 'umbrella' policy is not liable for any portion of the loss until the primary insurer's policy limit has been exhausted, even if the primary policy contains an other-insurance clause." *Nat'l Sur. Corp.*, 260 F.3d at 884 (citing *Vigilant Ins. Co. v. Allied Prop. & Cas. Ins. Co.*, 609 N.W.2d 538, 541 (Iowa 2000); *LeMars*, 494 N.W.2d at 219).

To determine whether a given policy is a primary policy with an "other insurance" provision or a "true excess" policy, Iowa courts consider the "polic[y] as a whole in light of the pattern of coverage intended to result from multiple policies." *LeMars*, 494 N.W.2d at 218. In doing so, "the court is permitted to consider the surrounding circumstances, the situation of the parties, and the objects the parties were striving to attain." *Id.* In identifying a policy as a "true excess" policy, the court may consider not only the title and terms of the policy but also the amount of the premium relative to the total amount of coverage. *Id.* at 219. For example, a low premium relative to the amount of risk insured is indicative of a "true excess" policy. *See id.* (noting the "yearly premium of only $120 for excess coverage of $1,000,000" reflected "[t]he 'umbrella' nature" of the policy). Furthermore, "[t]rue excess and

-18-

umbrella policies *require* the existence of a primary policy as a condition of coverage." *Nat'l Sur. Corp.*, 260 F.3d at 885. This is so because the "express purpose" of a "true excess" policy "is to protect the insured in the event of a catastrophic loss in which liability exceeds the available primary coverage." *Id.* (quoting 15 *Couch on Insurance* § 220:32, at 220-37).

Considering these factors, we conclude that the Policies are primary policies with an "other insurance" provision that would allow Liberty Mutual to seek contribution from other insurers—but not affect Pella's right to recover from Liberty Mutual in the first instance. Although the Policies are labeled as "excess," several other factors beyond the label strongly indicate that the Policies were intended to apply as primary coverage. First, and most importantly, the Policies do not require the existence of another, primary policy as a condition of coverage. In fact, the record indicates that Pella had no other applicable coverage during the policy periods from September 1, 2000, to September 1, 2006. Second, the Policies do not indicate that they were intended to cover only catastrophic losses. This is, in part, reflected by the third factor: as the district court observed, the Policies provided the same amount of coverage that Pella received under its pre-2001 primary policies. The amount of the premiums was similar, as well. Accordingly, the district court did not err in concluding that Pella did not have to exhaust all of its available insurance coverage before Liberty Mutual would owe a duty to reimburse defense costs.

### 2. *Coverage for the* Pappas *and* Saltzman *Suits*

In its last issue on appeal, Liberty Mutual argues that even if the district court correctly interpreted the Policies, it incorrectly concluded that the *Pappas* and *Saltzman* Suits alleged claims that the Policies covered. First, Liberty Mutual contends that the claims in both suits are grounded in fraud and therefore cannot be construed as alleging an "occurrence." Liberty Mutual maintains that, under Iowa law, "a claim alleging fraud does not allege an 'occurrence' as that term is defined in the [Policies]." (Citing *Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 102 (Iowa 1995); *Ellensohn*

-19-

*v. Am. Family Mut. Ins. Co.*, 96 F.3d 1075, 1075 (8th Cir. 1996)). Moreover, according to Liberty Mutual, both complaints alleged "that Pella either knew or, *at a minimum, should have known* that there was a substantial probability that damage would result from its actions." Thus, Liberty Mutual contends that both the *Pappas* and *Saltzman* Suits alleged non-accidental conduct and damages, and, therefore, not an "occurrence" under the Policies.

Second, Liberty Mutual contends that the *Pappas* Suit only alleged damage to Pella's windows and therefore did not allege covered "property damage." According to Iowa law, Liberty Mutual argues, a claim for defective workmanship cannot be considered an "occurrence," and the Policies specifically exclude damage to Pella's own "work" or "product." The factual allegations in the *Pappas* complaint only referred to damages to the plaintiffs' windows. Liberty Mutual acknowledges that the prayer for relief sought damages to repair the plaintiffs' homes, but it asserts that a "generic request for damages" does not mean that the claim is potentially covered.

As explained *supra* in Part II.A.1.a, unless otherwise stated in the policy, the duty to reimburse defense costs, like the duty to defend, is determined by the facts alleged in the complaint. The Iowa Supreme Court has explained, in the duty-to-defend context, that

> the *duty to defend* rests *solely* on whether the petition contains any allegations that *arguably* or *potentially* bring the action within the policy coverage. If any claim alleged against the insured can rationally be said to fall within such coverage, the insurer must defend the entire action. In case of doubt as to whether the petition alleges a claim that is covered by the policy, the doubt is resolved in favor of the insured.

*Emp'rs Mut. Cas. Co.*, 552 N.W.2d at 641 (quotation and citation omitted).

Accordingly, subject to other provisions, the Policies provide coverage for suits that allege property damage caused by an "occurrence." The Policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." While the Policies do not define the term "accident," the Iowa Supreme Court has defined an "accident," when used in an insurance policy, to mean:

> "an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force. . . . [G]iving to the word the meaning which a man of average understanding would, we think ["accident"] clearly implies a misfortune with concomitant damage to a victim, and not the negligence which eventually results in that misfortune."

*Pursell Constr. Inc. v. Hawkeye-Sec. Ins. Co.*, 596 N.W.2d 67, 70 (1999) (alterations in *Pursell*) (quoting *Cent. Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 448 (Iowa 1970)).

In *Pursell*, a contractor brought a declaratory judgment action against its insurer, seeking coverage under its comprehensive general liability (CGL) policy for claims brought against the contractor by a developer. *Id.* at 68. The developer had sued the contractor for breach of contract and negligence, alleging that the contractor improperly constructed two houses at an elevation below a floodplain. *Id.* The contractor sought coverage under its CGL policy, which provided coverage for "'property damage' . . . caused by an 'occurrence.'" *Id.* at 69. "The [CGL] policy define[d] 'occurrence' as 'an *accident*, including continuous or repeated exposure to substantially the same general harmful conditions.'" *Id.* at 70. The Iowa Supreme Court noted that the developer's claim against the contractor was "essentially one for defective workmanship." *Id.* To resolve the question of whether defective workmanship could constitute an "occurrence" covered by a CGL policy, the court

surveyed cases from other jurisdictions and quoted approvingly from an Arizona appellate court decision which explained:

> "If the [CGL] policy is construed as protecting a contractor against mere faulty or defective workmanship, the insurer becomes a guarantor of the insured's performance of the contract, and the policy takes on the attributes of a performance bond. We find these authorities unpersuasive."

*Id.* at 71 (quoting *U.S. Fid. & Guar. Corp. v. Advance Roofing & Supply Co.*, 788 P.2d 1227, 1233 (Ariz. Ct. App. 1989)). As a result, the Iowa Supreme Court adopted the "majority rule" and held "that defective workmanship standing alone, that is, resulting in damages only to the work product itself, is not an occurrence under a CGL policy." *Id.* The court explained that "the damages [the developer] seeks are limited to the very property upon which Pursell performed work" and "were not the result of an 'occurrence' as defined in the policy." *Id.*

Nearly ten years after *Pursell*, the Iowa Court of Appeals addressed a similar issue in *W.C. Stewart Construction, Inc. v. Cincinnati Insurance Co.*, 770 N.W.2d 850, 2009 WL 928871, at *1 (Iowa Ct. App. Apr. 8, 2009) (table opinion, publication decision pending), *rev. denied* (Iowa June 5, 2009). There, the insured, a subcontractor, sought coverage under a CGL policy for claims asserted against the subcontractor by a developer. *Id.* The developer alleged that the subcontractor's defective grading of a construction site caused "building movement and cracks in walls erected (presumably by other subcontractors) on the ground graded." *Id.* The CGL policy, like the policy in *Pursell*, limited coverage to an "occurrence," which it, like the policy in *Pursell*, defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* The subcontractor attempted to distinguish *Pursell* on the grounds that the developer's claim "asserted damages to property other than [the subcontractor's] work product." *Id.* at *3. The court of appeals rejected this argument, stating that the subcontractor had "read[]

*Pursell* too narrowly" because "[t]he faulty workmanship in *Pursell* required re-installation of plumbing and duct work with which Pursell had not been involved, just as the faulty workmanship by [the subcontractor] required reconstruction of walls [the subcontractor] had not built." *Id.* Because "the damages [the developer] sought were to the very property upon which [the subcontractor] performed work," the court held that the damages were not the result of an occurrence. *Id.* at *4. To hold otherwise, the court explained, "would improperly make the insurer a guarantor of the insured's work." *Id.*

In light of *Pursell* and *W.C. Stewart*, we conclude that the plaintiffs in the *Pappas* and *Saltzman* Suits did not allege property damage caused by an occurrence. Here, as in *Pursell*, the Policies provide coverage for "'property damage' . . . caused by an 'occurrence,'" which the Policies, as in *Pursell*, define as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Further, the *Pappas* and *Saltzman* plaintiffs alleged that Pella, much like the contractors in *Pursell* and *W.C. Stewart*, defectively designed and constructed its windows. Specifically, the *Pappas* complaint alleged that Pella knew that its windows had a defect that allowed water to leak through the window frame. Similarly, all of the claims in the *Saltzman* complaint derived from the allegation that Pella knew "that its windows contained an inherent defect that permitted [water] leakage." In both cases, the property damage—whether to the windows themselves or the structure of the building near the windows—was caused by a defect that Pella was alleged to have known about. Under Iowa law, such defective workmanship, as alleged in the *Pappas* and *Saltzman* Suits, cannot be considered an occurrence, i.e., "an undesigned, sudden, and unexpected event." *Pursell*, 596 N.W.2d at 70 (quotation and citation omitted).

Because the *Pappas* and *Saltzman* Suits did not allege an "occurrence," Liberty Mutual did not owe Pella a duty to reimburse its costs in defending either action. *See McCuen*, 946 F.2d at 1407; *Emp'rs Mut. Cas. Co.*, 552 N.W.2d at 641. As a result, we

need not address Liberty Mutual's alternative argument that the *Pappas* Suit did not allege "property damage" apart from the damage to the windows themselves.

### B. *Pella Cross-Appeal*
### 1. *Bad-Faith Claim*

In its cross-appeal, Pella argues that the district court erred in granting summary judgment to Liberty Mutual on Pella's claim for a bad-faith denial of insurance coverage. First, Pella contends that, under Iowa law, "*everything* an insurer does and says must be in good faith." In other words, even if Liberty Mutual had other reasonable grounds for denying coverage, Pella asserts that Liberty Mutual can be liable for a bad-faith claim because it did not act in good faith by denying coverage on the unreasonable grounds that the Policies required an "established occurrence" and the exhaustion of all other insurance. Second, Pella maintains that Liberty Mutual did not rely on the argument—either in denying coverage or in defending against Pella's bad-faith claim—that the Policies did not cover the claims in the *Pappas* and *Saltzman* Suits.

To establish a bad-faith claim under Iowa law, the insured must prove two elements: "(1) [the insurer] had no reasonable basis for denying the plaintiff's claim or for refusing to consent to settlement, and (2) the [the insurer] knew or had reason to know that its denial or refusal was without reasonable basis." *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005). "[W]here an objectively reasonable basis for denial of a claim *actually exists*, the insurer cannot be held liable for bad faith as a matter of law." *Id.* (quotations and citations omitted). Because we have concluded that Pella was not entitled to coverage for its defense costs in the *Pappas* and *Saltzman* Suits, *see supra* Part II.A.2, we necessarily conclude that Liberty Mutual had an objectively reasonable basis for denying Pella's claim.

Of course, implicit in the first element of a bad-faith claim is the requirement that the insurer *actually relied* on the reasonable basis in denying coverage. *See id.* at

474 (noting that a bad-faith claim fails if the insurer "took a position" on a reasonable basis). Although Liberty Mutual emphasized its "established occurrence" and "other insurance" arguments, the undisputed evidence in the record shows that it *also* denied coverage because it believed that the *Pappas* Suit did not allege covered "property damage," and the *Saltzman* Suit did not allege an "occurrence." Liberty Mutual communicated these positions to Pella in several coverage and reservation-of-rights letters. Because the undisputed record shows that Liberty Mutual relied on a reasonable basis for denying coverage, the district court properly granted summary judgment on Pella's bad-faith claim.

Pella's assertion that Liberty Mutual can be liable for a bad-faith claim by taking any position in bad faith is without merit. Iowa law requires a plaintiff in a bad-faith action to prove that the insurer had "*no* reasonable basis" for denying coverage. *Bellville*, 702 N.W.2d at 473 (emphasis added). In other words, a defendant can defeat a bad-faith claim by showing that it had only one reasonable basis for denying coverage—not by proving that all of its coverage positions were reasonable. Accordingly, we need not address whether Liberty Mutual's "actual occurrence" and "other insurance" arguments were also reasonable.

Finally, Pella contends that summary judgment was inappropriate because the court unfairly based its order on Liberty Mutual's two coverage positions that neither party briefed in its summary judgment motions on the bad-faith claim. "We have repeatedly held that . . . a district court commits reversible error when it grants summary judgment on an issue not raised or discussed by the parties." *Heisler v. Metro. Council*, 339 F.3d 622, 631 (8th Cir. 2003); *see* Fed. R. Civ. P. 56(f)(2) (authorizing the district court to grant summary judgment on grounds not raised by a party only after giving notice and a reasonable time to respond). Pella, however, overlooks the fact that, as the plaintiff in its bad-faith claim, it had the burden of proving that Liberty Mutual had "*no* reasonable basis" for denying coverage. *Bellville*, 702 N.W.2d at 473 (emphasis added). Liberty Mutual's motion asserted that summary

-25-

judgment was appropriate based on the undisputed record. Although Liberty Mutual emphasized its "actual occurrence" and "other insurance" *arguments*, the critical *issue* necessarily encompassed whether Liberty Mutual had *any* reasonable basis for denying coverage. Based on Liberty Mutual's coverage letters and its arguments before the district court, Pella knew that Liberty Mutual had also denied coverage because it believed the *Pappas* and *Saltzman* Suits did not allege covered claims. The district court did not grant summary judgment on an issue not raised by the parties because the ultimate *issue* never changed: the undisputed record showed that Pella could not establish that Liberty Mutual had "no reasonable basis" for denying coverage. Accordingly, the district court did not commit reversible error in granting summary judgment to Liberty Mutual.

## 2. *Defense Costs*

Finally, Pella argues that the district court erroneously limited the amount of defense costs that Pella could recover from Liberty Mutual. In light of our conclusion that Liberty Mutual had no duty to reimburse Pella's defense costs in the *Pappas* and *Saltzman* Suits, we need not address this issue.

## III. *Conclusion*

For the foregoing reasons, we affirm the district court's grant of summary judgment to Liberty Mutual on Pella's bad-faith counterclaim. We reverse the district court's order granting summary judgment to Pella on Liberty Mutual's claim for declaratory judgment and remand with instructions to enter declaratory judgment in favor of Liberty Mutual.

_____