Port Auth. of N.Y. & N.J. v Brickman Group Ltd., LLC (2019 NY Slip Op 08958)





Port Auth. of N.Y. & N.J. v Brickman Group Ltd., LLC


2019 NY Slip Op 08958


Decided on December 12, 2019


Appellate Division, First Department


Friedman, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 12, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

David Friedman,J.P.
John W. Sweeny, Jr.
Troy K. Webber
Ellen Gesmer
Anil C. Singh, JJ.


451213/17 8963 

[*1]The Port Authority of New York and New Jersey, Plaintiff-Appellant,
v
The Brickman Group Ltd., LLC, et al., Defendants-Respondents.



Plaintiff appeals from the order of the Supreme Court, New York County (David B. Cohen, J.), entered on or about June 27, 2018, which, to the extent appealed from as limited by the briefs, granted defendant ACE American Insurance Company's motion and defendant Everest National Insurance Company's cross motion to dismiss the complaint as against each of them, denied plaintiff's request (deemed by the court to constitute a cross motion) for leave to amend its complaint to assert a cause of action against defendant Brickman Group, Ltd., LLC for breach of an agreement to procure insurance, and denied plaintiff's cross motion for summary judgment declaring that ACE and Everest are obligated to indemnify it for its liability to the plaintiffs in the underlying actions and to reimburse it for the costs it incurred in defending itself in the underlying actions.



Hurwitz & Fine, P.C., Buffalo (Dan D. Kohane and Jennifer A. Ehman of counsel), for appellant.
Ahmuty, Demers & McManus, New York (Glenn A. Kaminska and Nicholas M. Cardascia of counsel), for The Brickman Group Ltd., LLC, respondent.
Robinson & Cole LLP, New York (J. Gregory Lahr, Cara C. Vecchione and Elise A. Smith of counsel), for ACE American Insurance Company, respondent.
Kennedys CMK LLP, New York (Daniel Pickett of counsel), for Everest National Insurance Company, respondent.



FRIEDMAN, J.P.


In this insurance coverage action brought by a putative additional insured, the liability insurance policies at issue do not impose on the insurers a duty to defend the insured in a covered action. The policies do, however, require the insurers to reimburse the insured for defense costs incurred in an action "in which damages . . . to which this insurance applies are alleged." The ultimate factual determination in the underlying personal injury actions was that the loss was actually outside the scope of the additional insured coverage. This determination, while it means that the insurers have no duty to indemnify the putative additional insured for its liability to pay damages, is not conclusive of a different question posed to us, which is whether the putative additional insured is entitled reimbursement of its defense costs.
The party seeking a declaration that it is entitled to coverage as an additional insured is plaintiff the Port Authority of New York and New Jersey (the Port Authority). The Port Authority was a defendant in two long-running personal injury actions, in which it was alleged that the plaintiffs' injuries resulted from, among other causes, the negligence of defendant The Brickman Group Ltd., LLC (Brickman Group), a contractor of the Port Authority and the named insured under the subject policies, or the negligence of a subcontractor of Brickman Group. The Port Authority now seeks, among other relief, a declaration that it is entitled to reimbursement of its defense costs in those actions as an additional insured under Brickman Group's policies. The Port Authority seeks to have its defense costs reimbursed notwithstanding that it was ultimately determined in the underlying actions that the Port Authority itself was the sole party at fault for the accident — a determination that, as more fully discussed below, places the Port Authority's liability to the underlying plaintiffs outside the scope of its additional insured coverage. We hold, however, that the ultimate liability determination in the underlying actions does not prevent the Port Authority from obtaining reimbursement of its defense costs from Brickman Group's insurers under the relevant policy language, given that "damages . . . to which [the additional insured coverage] applie[d]" were "alleged" in those actions from inception until the verdict adverse to the Port Authority was returned.
Factual Background
The Contract Between the Port Authority and Brickman Group
The Port Authority and Control Environmental Services, Inc. (CES) entered into a contract, dated May 31, 2007 (hereinafter, the maintenance contract), under which CES assumed responsibility for maintaining the landscaping and irrigation systems in the area of the Van Wyck Expressway at John F. Kennedy International Airport (JFK) for a term of 34 months. In June 2007, CES, with the Port Authority's consent, assigned the maintenance contract to Brickman Group. The maintenance contract contains a provision requiring Brickman Group to maintain a commercial general liability insurance policy (or policies) covering the Port Authority as an additional insured for a specified amount of liability for bodily injury. The maintenance contract also contains a provision requiring Brickman Group to indemnify, hold harmless, and, "[i]f so directed," defend the Port Authority from and against all claims "in any way connected with" Brickman Group's services under the contract. Additional Insured Endorsements to
Brickman Group's ACE Policy
At the time relevant to this appeal, Brickman Group was the named insured under a commercial general liability policy issued by defendant ACE American Insurance Company (ACE) for the period from July 1, 2008, to July 1, 2009. As here pertinent, the ACE policy covers liability for "bodily injury" occurring during the policy period. The policy includes, among others, the following endorsements addressing additional insured coverage:
• Endorsement No. 17 provides, in pertinent part, that coverage is extended to "[a]ny person or organization whom you [i.e., Brickman Group] have agreed to include as an additional insured by contract or agreement," but such coverage is extended "only with respect to liability arising out of your operations . . ." (emphasis added).
• Endorsement No. 21 provides, in pertinent part, that coverage is extended to "[a]ll persons or organizations where required by contract," but such coverage is extended "only with respect to liability for bodily injury' . . . caused, in whole or in part, by . . . [y]our [i.e., Brickman Group's] acts or omissions; or . . . [t]he acts or omissions of those acting on your behalf; in the performance of your ongoing operations for the additional insured(s) . . ." (emphasis added).[FN1]
Additional provisions of the ACE policy that are relevant to this appeal are set forth in the course of our discussion of the legal issues.
Brickman Group's Everest Policy
Also in effect at the time relevant to this appeal was a commercial excess liability policy issued by defendant Everest National Insurance Company (Everest) to Brickman Group as the named insured. The Everest policy provides that it is excess to Brickman Group's ACE policy (denominated the "first underlying insurance"). The Everest policy further provides that "[t]he coverage provided by this policy will:
"a. Follow the terms, definitions, conditions and exclusions that are contained in the first underlying insurance', unless otherwise directed by this policy, including any attached endorsement; and
"b. Not be broader than that provided by the first underlying insurance.'"
The Everest policy also provides that it covers as an insured "[a]ny person or organization qualifying as such under the first underlying insurance.'" The November 2008 Incident and the Underlying Actions
The incident giving rise to this dispute occurred on November 22, 2008, during a period of below-freezing temperatures. On or about that date, sprinkler heads on the property of JFK discharged water onto the Van Wyck Expressway, which resulted in the formation of a layer of ice on the roadway. A multi-vehicle collision occurred when drivers on the Van Wyck encountered the ice [FN2]. The sprinklers that had discharged the water were part of the irrigation system for which Brickman Group was responsible under the maintenance contract. Brickman Group's winterization subcontractor, nonparty Metro Irrigation & Maintenance Corp. (Metro), was working at JFK at or about the time of the accident.
The November 2008 car pileup gave rise to two personal injury actions in Supreme Court, [*2]Kings County (hereinafter, the underlying actions), each of which was commenced in 2009 [FN3]. The named defendants in each of the underlying actions included, among others, the Port Authority, Brickman Group, and Metro. The complaints in the underlying actions contained allegations that the discharge of water onto the Van Wyck had resulted from the negligence of the Port Authority, Brickman Group and/or Metro. The Port Authority, which was represented by its in-house counsel in that litigation, asserted cross claims against Brickman Group for contractual indemnification, common-law indemnification, contribution and breach of contract.[FN4]
The underlying actions were consolidated for a joint trial on the issue of liability, which was held in April 2017. During the trial, the court dismissed Brickman Group from the case and held the Port Authority liable as a matter of law [FN5]. At the close of the evidence, the jury was asked to determine whether any negligence by Metro or by one of the plaintiffs (Kandel) was a substantial factor in causing the accident and, if so, to apportion fault for the accident among either or both of those parties and the Port Authority (which, as noted, the court had previously ruled liable as matter of law). On April 25, 2017, the jury returned a verdict finding that neither Metro nor Kandel had been negligent and assigning 100 percent of the fault for the accident to the Port Authority. The Port Authority subsequently settled with the plaintiffs in the underlying actions.[FN6]
On May 3, 2017, Brickman Group moved to dismiss the Port Authority's cross claims against it in the underlying actions. Brickman Group argued, among other things, that, given the jury's finding that the Port Authority was the sole party at fault for causing the accident, Brickman Group could not be held liable to the Port Authority under the maintenance contract's indemnification provision. In opposition, the Port Authority argued, as relevant to this appeal, that Brickman Group was obligated under the maintenance contract to procure liability insurance for the Port Authority, and that the determination of whether such insurance had been procured [*3]should be deferred to a proceeding to which Brickman Group's insurers were parties [FN7]. By order dated June 28, 2017, and entered July 6, 2017, Kings County Supreme Court granted Brickman Group's motion. Thereafter, on September 12, 2017, a judgment was entered that dismissed with prejudice all of the Port Authority's cross claims against Brickman Group in the underlying actions. The Port Authority has taken an appeal to the Second Department from that judgment, which appeal has not yet been decided. Prior Proceedings in this Action
On April 28, 2017 — three days after the return of the verdict in the underlying actions, and five days before Brickman Group moved to dismiss the Port Authority's cross claims therein — the Port Authority commenced this action against Brickman Group, ACE and Everest in Supreme Court, New York County. The Port Authority's complaint asserts two causes of action, the first for a declaration that the Port Authority is entitled to defense and indemnification in the underlying actions under the ACE and Everest policies. The second cause of action is for damages for breach of contract against the insurers, based on their respective policies, and against Brickman Group, based on the latter's alleged breach of the maintenance contract by failing to provide the Port Authority with indemnity and defense in the underlying actions.[FN8]
On or about August 8, 2017 — after Brickman Group's motion to dismiss the Port Authority's cross claims against it in the underlying actions had been granted — Brickman Group moved in this action to dismiss the complaint as against it. Insofar as relevant to this appeal, Brickman Group argued that any claim the Port Authority might have against it was barred both by the statute of limitations and by the doctrines of res judicata and collateral estoppel. In its opposition to the motion, the Port Authority requested that it be permitted to amend its complaint to assert a claim against Brickman Group for failing to procure insurance as required by the maintenance contract. The Port Authority did not, however, make a formal cross motion for such relief.
While Brickman Group's motion to dismiss was still pending, ACE moved to dismiss the complaint as against it pursuant to CPLR 3211(a)(1) and (7), and Everest made a cross motion for the same relief as to itself. The Port Authority opposed the insurers' motions and cross-moved for summary judgment declaring that it was entitled to coverage under the ACE and Everest policies for both indemnity and defense costs in the underling actions.
The Decision Appealed From
Supreme Court consolidated the motions described above for disposition and determined them in a decision and order entered June 27, 2018. The court granted the motions to dismiss by Brickman Group, ACE and Everest and denied the Port Authority's cross motion for summary judgment against ACE and Everest. As to the Port Authority's request for leave to amend the complaint to assert a claim against Brickman Group for failing to procure insurance coverage, the court treated that request as a formal cross motion and denied it. This appeal by the Port Authority ensued.
Discussion
For the reasons discussed below, we modify the order appealed from to grant the Port Authority's cross motion for summary judgment to the extent of declaring that ACE and Everest are obligated, within the limits of their respective policies, to reimburse the Port Authority for the costs it reasonably incurred, in excess of the "retained limit" under the ACE policy (as explained below), in defending the underlying actions through the date on which the jury rendered its verdict. We affirm Supreme Court's denial of the Port Authority's request for leave to amend the complaint to assert a new claim against Brickman Group and the court's determination that the insurers have no duty to indemnify the Port Authority for its liability to the plaintiffs in the underlying actions.[FN9]
We turn first to the portion of the court's decision dealing with the Port Authority's attempt to assert claims against Brickman Group. On its appeal from this aspect of the order, the Port Authority challenges only the denial of its request (which the court treated as a cross motion) for leave to amend its complaint to assert a claim against Brickman Group for failing to fulfill its obligation under the maintenance contract to procure insurance coverage for the Port Authority. The court correctly denied this request, on two separate grounds.[FN10]
First, contrary to the Port Authority's argument that a failure to procure contractually required insurance is a continuing breach, a claim for such a breach accrues upon the failure to procure the coverage when the obligation to do so first attaches (see Wright v Emigrant Sav. Bank, 112 AD3d 401, 402 [1st Dept 2013]; Polat v Fifty CPW Tenants Corp., 249 AD2d 163, 163-164 [1st Dept 1998]; Sloniger v Niagara Mohawk Power Corp., 306 AD2d 842, 842 [4th Dept 2003]; see generally Ely-Cruikshank Co. v Bank of Montreal, 81 NY2d 399, 402 [1993]). Accordingly, any claim based on a failure to procure the insurance required by the maintenance contract, which was assigned to Brickman Group in 2007, was already barred by the applicable six-year statute of limitations (CPLR 213[2]) when the Port Authority commenced this action in 2017.
Second, the judgment in the underlying actions dismissing with prejudice the Port Authority's cross claims against Brickman Group constitutes res judicata barring the Port Authority's assertion in this action of a contractual claim against Brickman Group for failing to procure insurance. This is because the proposed claim for failing to procure insurance arises out of the same series of transactions that gave rise to the Port Authority's cross claims against Brickman Group in the underlying actions (see Matter of Hunter, 4 NY3d 260, 269 [2005]; Elias v Rothschild, 29 AD3d 448 [1st Dept 2006]). Indeed, it appears that the Port Authority's contractual indemnity and breach of contract cross claims against Brickman Group in the underlying actions sought precisely the same damages that would be sought by the claim for failure to procure insurance that the Port Authority proposes to assert in this action, the only [*4]difference being the legal theory of recovery (see Hunter, 4 NY3d at 269 ["claims arising out of the same transaction or series of transactions (as a finally determined claim) are barred, even if based upon different theories"] [internal quotation marks omitted]). That the proposed insurance procurement claim in this action arises from the same subject matter as the cross claims in the underling actions is further highlighted by the fact that the Port Authority, in opposing the dismissal of the cross claims, invoked — to no avail — Brickman Group's contractual obligation to procure insurance coverage.
We next consider the question of whether the Port Authority is covered, as an additional insured under the ACE and Everest policies, either for the liability imposed on it, or for the defense costs it incurred, in the underlying actions. As noted, in the order appealed from, the court held, in ruling on the insurers' motions to dismiss and the Port Authority's motion for summary judgment, that the Port Authority was not entitled to any coverage under these policies. In reviewing this determination, we shall first consider the question of whether the insurers have a duty to indemnify the Port Authority and then turn to the question of whether they have a duty to reimburse the Port Authority's defense costs.[FN11]
As previously discussed, it was determined in the underlying actions that neither Brickman Group nor its subcontractor, Metro, bore any fault for the accident that resulted in the plaintiffs' injuries. In view of the exoneration of Brickman Group and Metro, the court in this action correctly determined that the insurers have no obligation to indemnify the Port Authority for its liability to the plaintiffs in the underlying actions. This conclusion is the same under either of the two aforementioned potentially applicable additional insured endorsements to the ACE policy, Endorsement No. 17 and Endorsement No. 21.[FN12]
Endorsement No. 21 to the ACE policy, the more narrowly drawn provision, extends additional insured coverage to the Port Authority "only with respect to liability . . . caused, in whole or in part, by your [Brickman Group's] acts or omissions; or . . . [t]he acts or omissions of those acting on your behalf." The Court of Appeals has held that this language ("liability caused, in whole or in part, by your acts or omissions") does not afford additional insured coverage where — as here — it has been determined that "the named insured bears no legal fault for the underlying harm" (Burlington Ins. Co. v NYC Tr. Auth., 29 NY3d 313, 317 [2017]). The Port Authority therefore is not entitled to indemnity coverage for this loss under Endorsement No. 21.
Endorsement No. 17 to the ACE policy, the broader provision, affords additional insured coverage, in pertinent part, "only with respect to liability arising out of your [Brickman Group's] operations." While Brickman Group was responsible for maintaining the irrigation system that malfunctioned, it was determined in the underlying actions, to reiterate, that the malfunction arose solely from the Port Authority's own negligence, not from any negligence by either Brickman Group or Metro. The Port Authority correctly points out that the operative language of Endorsement No. 17 ("liability arising out of your operations") covers claims against an additional insured for injuries to the named insured's employees, even if the named insured is not (or is not alleged to have been) at fault (see Regal Constr. Corp. v National Union Fire Ins. Co. of Pittsburgh, PA, 15 NY3d 34 [2010]). This point is unavailing, however, since the plaintiffs in the underlying actions were not employees of the named insured, Brickman Group, or of any subcontractor of Brickman Group. The irrigation system maintained by Brickman Group therefore "was merely the situs of the accident" and "there was [no] connection between [the] accident and the risk for which coverage [under Endorsement No. 17] was intended" (Worth Constr. Co., Inc. v Admiral Ins. Co., 10 NY3d 411, 416 [2008]).
The Court of Appeals' decision in Worth is instructive. The loss at issue in Worth was an injury to a construction worker who had slipped on a staircase installed by one subcontractor (Pacific), to which fireproofing had been applied by a different subcontractor. The injured worker was not an employee of Pacific. In the declaratory judgment action giving rise to the appeal to the Court of Appeals, the general contractor (Worth) sought additional insured coverage under Pacific's policy, which included an additional insured endorsement with the same "arising out of your operations" language as Endorsement No. 17 here. However, in the underlying personal injury litigation, Worth had admitted that its third-party claim against Pacific had no merit because Pacific had not been negligent in installing the staircase (10 NY3d at 414-415). Based on this admission, the Court of Appeals held that the loss had not arisen out of Pacific's operations for purposes of the additional insured endorsement. The Court of Appeals explained:
"Once Worth admitted that its claims of negligence against Pacific were without factual merit, it conceded that the staircase was merely the situs of the accident. Therefore, it could no longer be argued that there was any connection between [the worker's] accident and the risk for which coverage was intended" (id. at 416).
In this case, given the determinations in the underlying actions that Brickman Group and Metro, its subcontractor, were not negligent, the irrigation system is analogous to the staircase in Worth as "merely the situs of the accident" (id.).
The Port Authority does not dispute that it is bound by the determination in the underlying actions that it is the sole party at fault for the causation of the accident. However, in support of its cross motion for summary judgment, the Port Authority argues that this determination does not resolve the question of whether its liability arose "out of [Brickman Group's] operations" for purposes of Endorsement No. 17. This argument is unavailing. That Brickman Group was obligated to maintain the instrumentality by which the accident was caused (i.e., the irrigation system) does not mean that the accident arose from Brickman Group's "operations" where (1) the persons injured were not employees of Brickman Group or Metro, its subcontractor, (2) it has been determined that neither Brickman Group nor Metro bears any fault [*5]for the accident, and (3) the Port Authority has not produced sufficient evidence even to raise an issue as to whether any act of Brickman Group or Metro, even if nonnegligent, was a link in the chain of causation that led to the accident, much less to establish such causation as a matter of law (cf. Burlington, 29 NY3d at 332 n 5 [Fahey, J., dissenting] [noting that a "non-negligent" act may be a cause of an accident])[FN13]. Accordingly, Endorsement No. 17, like Endorsement No. 21, does not afford the Port Authority indemnity coverage for its liability to the plaintiffs in the underlying actions, and, on a search of the record pursuant to CPLR 3212(b), we grant the insurers summary judgment to that effect.
This brings us to the question of whether the Port Authority, although not entitled to indemnity in the underlying actions, is entitled to reimbursement of any of the defense costs it incurred in that litigation as an additional insured under Brickman Group's policies. The Port Authority, in its appellate brief, makes clear that it "is not asking ACE to assume . . . [its] defense" in the underlying actions, since "[t]he case is over," but simply to reimburse the costs of its unsuccessful defense. While the terms of the ACE policy plainly exclude any duty to defend an insured in litigation (as more fully discussed below), it does not follow from the absence of a duty to defend that there is no obligation to reimburse defense costs.[FN14]
The ACE policy's insuring agreement provides, in pertinent part:
"We will pay the insured for the ultimate net loss' in excess of the retained limit' shown in the Declarations that the insured becomes legally obligated to pay as damages because of bodily injury' or property damage' to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under DEFENSE, INVESTIGATION, SETTLEMENT, LEGAL EXPENSES, AND INTEREST ON JUDGMENTS" (emphasis added).
The Declarations indicate that the "retained limit" under the ACE policy is $500,000 for each occurrence.
As amended by Endorsement No. 29 to the ACE policy, the policy's provision under the heading "Defense, Investigation, Settlement, Legal Expenses, and Interest on Judgments" (which is referenced in the above-quoted insuring agreement) provides in pertinent part:
"This policy does not apply to defense, investigation, settlement, or legal expenses, other than loss adjustment expense,' or prejudgment interest arising out of any occurrence' or offense, but we shall have the right and opportunity to assume from the insured the defense and control of any claim or suit', including any appeal from a judgment, seeking payment of damages covered under this policy that we believe likely to exceed the retained limit'. In such event we and the insured shall cooperate fully. Our obligation to pay Loss Adjustment Expense' ends when we have used up the applicable Limits of Insurance in payment of Ultimate Net Loss'" (emphasis added).[FN15]
Endorsement No. 29 further defines the term "loss adjustment expense" in the above-quoted paragraph, in pertinent part, as follows:
" Loss adjustment expense' means such claim expenses and costs incurred by the insured or by us in connection with the investigation, administration, adjustment, settlement or defense of any claim or suit' to which this policy applies. Such expenses include, but are not limited to, attorneys' fees for claims in suit, court costs and related costs such as filing fees . . . ."
In addition, Endorsement No. 29 provides that "[l]oss adjustment expense" (as defined above) [*6]"shall be included within the retained limit'" specified in the Declarations.
Notwithstanding that the ACE policy does not impose on the insurer any duty to defend, the policy, as amended by Endorsement No. 29, does require the insurer to pay "loss adjustment expense" in excess of the retained limit, up to the policy limits [FN16]. The term "loss adjustment expense" is defined by Endorsement No. 29 to include "expenses and costs incurred by the insured . . . in connection with the investigation, administration, settlement or defense of any claim or suit' to which this policy applies," including "attorneys' fees for claims in suit." Furthermore, the endorsement provides that " [l]oss adjustment expense' shall be included within the [insured's] retained limit'."[FN17]
The question to be answered on this appeal is whether, in the absence of any duty to defend, the duty to reimburse "loss adjustment expense" under Endorsement No. 29 to the ACE policy depends on the complaint's containing allegations that (if true) would put the loss within the scope of coverage or, in the alternative, on the facts as ultimately determined at the end of the action. In this case, if the duty to reimburse depends on the facts as finally adjudicated in the underlying actions, the conclusion would be that the Port Authority's defense costs are not covered. This is because, as previously discussed, the exoneration of Brickman Group and Metro in the underlying actions means that, in fact, the loss was not "caused, in whole or in part," by Brickman Group's "acts or omissions" for purposes of Endorsement No. 21, nor did the loss "aris[e] out of [Brickman Group's] operations" for purposes of Endorsement No. 17. However, if the allegations of the complaint constitute the determinative factor for purposes of the duty to reimburse, the conclusion would be that the Port Authority's defense costs are covered. As explained in the following paragraph, that is the conclusion we reach.
Again, Endorsement No. 29 defines the "loss adjustment expense" covered by the ACE [*7]policy, in pertinent part, as "such claim expenses and costs incurred by the insured . . . in connection with the . . . defense of any claim or suit' to which this policy applies" (emphasis added). The policy defines the term "suit," in pertinent part, to mean "a civil proceeding in which damages because of bodily injury' . . . to which this insurance applies are alleged" (emphasis added). Under the policy's additional insured endorsements, the insurance applies to liability for bodily injury "arising out of [Brickman Group's] operations" (Endorsement No. 17) or "caused, in whole or in part, by . . . [Brickman Group's] acts or omissions" (Endorsement No. 21). The complaint in each of the underlying actions alleged that negligence by Brickman Group and/or Metro, its subcontractor, was a cause of the plaintiff's injuries. Thus, " bodily injury' . . . to which [the] insurance applie[d]" was "alleged" in each of the underlying actions, from inception through the return of the jury's liability verdict, at which point both Brickman Group and Metro had been exonerated. Until that time, by reason of the allegations placing the loss within the scope of the additional insured coverage, each of the underlying actions had been a "suit" within the meaning of the policy's definition of a covered "loss adjustment expense."[FN18] This fact was not retroactively changed by the ultimate determination rendered in the underlying actions concerning the causation of the plaintiffs' injuries.
Moreover, the ACE policy defines "loss adjustment expense" simply as the "costs incurred . . . in connection with the . . . defense of any . . . suit' to which this policy applies," without excluding the cost of defending against noncovered claims within the same action. Accordingly, there is no need to allocate the Port Authority's defense costs in the underlying actions between covered and noncovered claims. To the extent the policy language might be deemed to be ambiguous on this point, we again note that "any ambiguity must be construed in favor of the insured and against the insurer" (White, 9 NY3d at 267).
Based on the foregoing analysis, we conclude that the ACE policy, on its face, covers the costs the Port Authority incurred in defending the underlying actions through the return of the verdict on April 25, 2017, notwithstanding that the policy does not cover the Port Authority for its liability to the plaintiffs in those actions [FN19]. Although the determinative factor in deciding this appeal is the particular policy language at issue, we note that this result is consistent with this Court's statement that "[t]he same allegations [in a complaint] that trigger a duty to defend trigger an obligation to pay defense costs" (Kozlowski, 18 AD3d at 40 [internal quotation marks omitted]; see also Westpoint Intl., Inc. v American Intl. S. Ins. Co., 71 AD3d 561, 563 [1st Dept 2010] ["Having failed to demonstrate that there is no possibility of coverage, (the insurer) cannot avoid its obligation to advance defense costs," notwithstanding that there was no duty to defend under the policy]; Lowy v Travelers Prop. & Cas. Co., 2000 WL 526702, *2 n 1, 2000 US Dist LEXIS 5672, *6 n 1 [SD NY 2000] ["(T)here is no relevant difference between the allegations [*8]that trigger an insurer's duty to defend and the allegations that trigger an insurer's obligation to pay defense expenses"])[FN20]. Beyond question, if the standard for triggering the duty to defend is applied to the duty to pay defense costs at issue in this case, the Port Authority is entitled to reimbursement of its defense costs in the underlying actions through the end of the liability trial.
The standard used to determine whether a duty to defend has been triggered is whether "the allegations in a complaint state a cause of action that gives rise to the reasonable possibility of recovery under the policy" (Fieldston Prop. Owners Assn., Inc. v Hermitage Ins. Co., 16 NY3d 257, 264 [2011] [internal quotation marks omitted]). It is irrelevant that any judgment ultimately entered against the insured might be based on claims not covered and, as such, might not be subject to the duty to indemnify (see BP A.C. Corp., 8 NY3d at 714). Moreover, the duty to defend extends to the entire action "if any of the claims against an insured arguably arise from covered events" (Fieldston, 16 NY3d at 264 [internal quotation marks omitted]). Plainly, the allegations in the underlying actions that negligence by the named insured, Brickman Group, and/or its subcontractor, Metro, was a cause of the accident — allegations that, if proven, would have placed the loss squarely within the scope of the ACE policy's additional insured coverage — "g[ave] rise to the reasonable possibility of recovery under the policy" (Fieldston, 16 NY3d at 264 [internal quotation marks omitted]).[FN21]
We also note that the trend of recent case law, in situations where there is a duty to [*9]reimburse defense costs but no duty to defend, is to "apply traditional duty to defend analysis when determining whether insurers must advance or reimburse insureds' defense expenses" (Douglas R. Richmond, Liability Insurance and the Duty to Pay Defense Expenses Versus the Duty to Defend, 52 Tort Trial & Ins Prac L J 1, 9 [2016]; see also id. at 9-10 n 45 [citing cases]). As a federal appeals court has observed, "[S]tate courts generally have viewed an insurer's duty to advance defense costs as an obligation congruent to the insurer's duty to defend, concluding that the duty arises if the allegations in the complaint could, if proven, give rise to a duty to indemnify" (Pella, 650 F3d at 1170 [internal quotation marks omitted]; see also id. ["Therefore, even though this case does not involve a duty to defend, the parameters of that duty, under Iowa law, nevertheless guide our analysis of Liberty Mutual's duty to reimburse Pella's defense costs"]; Worthington Fed. Bank v Everest Natl. Ins. Co., 110 F Supp 3d 1211, 1222 [ND Ala 2015] ["Courts considering whether an insurer's obligation to advance defense costs is triggered generally do so using standards that are the same or similar to those employed to ascertain whether an insurer has a duty to provide the defense itself . . . The court will likewise do so here"]; American Chem. Socy. v Leadscope, Inc., 2005 WL 1220746, *8, 2005 Ohio App LEXIS 2428, *22 [Ohio Ct App 2005] ["We see no reason to make a distinction between duty to defend cases and duty to advance defense costs cases with respect to the application of the one claim-all claims principle and pleadings test"]; Restatement of Liability Insurance § 22[2][a] [2019] [taking the position that, where a policy requires the insurer to pay defense costs on an ongoing basis but not to provide a defense, "(t)he scope of the insurer's defense-cost obligation is determined using the rules governing the duty to defend"]).
Finally, we acknowledge that, in each of the cases cited in the foregoing discussion, the court appears to have determined that the insured was entitled to have the insurer pay its defense costs while the question of the insured's liability was still being litigated in the underlying proceedings. In this case, by contrast, the Port Authority chose not to press its claim against ACE and Everest for reimbursement of its defense costs until after its liability had been adjudicated in the underlying actions and — as a result of the exoneration of Brickman Group and Metro — had been determined to fall outside the scope of its additional insured coverage [FN22]. Under the terms of the ACE policy, the timing of the Port Authority's demand for reimbursement does not defeat its claim for reimbursement of its defense costs through the time its liability was adjudicated in the underlying actions. As previously discussed, the ACE policy entitles the insured to coverage of the costs it incurred in defending "any . . . suit' to which this policy applies," and the policy defines the term "suit" to mean an action "in which damages because of bodily injury' . . . to which this insurance applies are alleged" (emphasis added). To reiterate, until the jury rendered the verdict adverse to the Port Authority, each of the underlying actions remained a " suit' to which th[e] [ACE] policy applie[d]" by reason of the allegations therein against Brickman Group and Metro.
Accordingly, the order of the Supreme Court, New York County (David B. Cohen, J.), entered on or about June 27, 2018, which, to the extent appealed from as limited by the briefs, granted ACE's motion and Everest's cross motion to dismiss the complaint as against each of them, denied the Port Authority's request (deemed by the court to constitute a cross motion) for leave to amend its complaint to assert a cause of action against Brickman Group for breach of an agreement to procure insurance, and denied the Port Authority's cross motion for summary judgment declaring that ACE and Everest are obligated to indemnify it for its liability to the plaintiffs in the underlying actions and to reimburse it for the costs it incurred in defending itself [*10]in the underlying actions, should be modified, on the law, to grant ACE and Everest partial summary judgment, on a search of the record, declaring that ACE and Everest have no duty to indemnify the Port Authority for its liability to the plaintiffs in the underlying actions, to grant the Port Authority's cross motion for summary judgment to the extent of declaring that ACE and Everest are obligated, within the limits of their respective policies, to reimburse the Port Authority for the costs it reasonably incurred, in excess of the "retained limit" under the ACE policy, in defending the underlying actions from their inception through April 25, 2017, and to deny ACE's motion and Everest's cross motion to dismiss the complaint as against each of them, and otherwise affirmed, without costs, and the matter remanded to Supreme Court for further proceedings to determine the amounts due the Port Authority from ACE and Everest for the reimbursement of its defense costs in the underlying actions.
All concur.
Order, Supreme Court, New York County (David B. Cohen, J.), entered on or about June 27, 2018, modified, on the law, to grant ACE and Everest partial summary judgment, on a search of the record, declaring that ACE and Everest have no duty to indemnify the Port Authority for its liability to the plaintiffs in the underlying actions, to grant the Port Authority's cross motion for summary judgment to the extent of declaring that ACE and Everest are obligated, within the limits of their respective policies, to reimburse the Port Authority for the costs it reasonably incurred, in excess of the "retained limit" under the ACE policy, in defending the underlying actions from their inception through April 25, 2017, and to deny ACE's motion and Everest's cross motion to dismiss the complaint as against each of them, and otherwise affirmed, without costs, and the matter remanded to Supreme Court for further proceedings to determine the amounts due the Port Authority from ACE and Everest for the reimbursement of its defense costs in the underlying actions.
Opinion by Friedman, J. All concur.
Friedman, J.P., Sweeny, Webber, Gesmer, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: DECEMBER 12, 2019
DEPUTY CLERK



Footnotes

Footnote 1:Another additional insured endorsement to the ACE Policy (Endorsement No. 75), although it refers to the Port Authority by name, is not relevant to this matter because it did go into effect until April 1, 2009, which was several months after the occurrence of the incident giving rise to this litigation.

Footnote 2:The manner in which the accident occurred is described in Kandel v FN; Taxi; Inc. (137 AD3d 980, 980-981 [2d Dept 2016]).

Footnote 3:The underlying actions were Pavel Kandel, et al. v FN; Taxi; Inc. d/b/a FN Taxi, Inc., et al., Sup Ct, Kings County, index No. 3625/09, and Robert Favors v Port Auth. of New York and New Jersey, et al., Sup Ct, Kings County, index No. 27151/09.

Footnote 4:The Port Authority, in its complaint in this action, alleges that, in 2009, it tendered its defense in each of the underlying actions "to BRICKMAN and/or its insurers, including but not limited to ACE and EVEREST," but the tenders were not accepted.

Footnote 5:The record for this appeal does not include any decision or transcript setting forth the basis for these trial rulings in the underlying actions. An affirmation by the Port Authority's counsel that is in the record states that Kings County Supreme Court "ruled that Brickman [Group] owed no duty to the plaintiffs as they are not parties to the . . . [maintenance] [c]ontract."

Footnote 6:An affirmation of the Port Authority's counsel in the record states: "After the liability trial, the Kandel Action settled for an amount that the parties agreed to keep confidential, and subsequent to the damages trial, the Favors Action settled for a sum below the jury award."

Footnote 7:Although the Port Authority had asserted cross claims for breach of contract against Brickman Group in its answers in the underlying actions, the pleadings did not allege that Brickman Group had breached the maintenance contract by failing to procure insurance coverage.

Footnote 8:The complaint, while it refers to Brickman Group's obligation under the maintenance contract to procure insurance coverage for the Port Authority, does not specifically allege that Brickman Group failed to fulfill that obligation.

Footnote 9:While Supreme Court, in granting ACE's and Everest's respective motions to dismiss, correctly determined that the insurers have no duty to indemnify the Port Authority for its liability to the plaintiffs in the underlying actions, we modify this aspect of its order to render a declaration to that effect on a search of the record prompted by the Port Authority's cross motion for summary judgment (see CPLR 3212[b]; see also Lanza v Wagner, 11 NY2d 317, 334 [1962], cert denied 371 US 901 [1962]).

Footnote 10:Since we conclude that the Port Authority's request for leave to amend its complaint was correctly denied on the merits, we need not address Brickman Group's contention that the Port Authority's arguments challenging the denial of the request should not be considered on procedural grounds.

Footnote 11:As previously noted, the Everest policy, which is excess to the ACE policy, provides that it "[f]ollow[s] the terms, definitions, conditions, and exclusions" of the ACE policy, and further provides that it covers as an insured "[a]ny person or organization qualifying as such under [the ACE policy]." Accordingly, in the discussion that follows, we refer to the provisions of the ACE policy only.

Footnote 12:Because there is no indemnity coverage under either endorsement, we need not address the insurers' argument that, in the event there were coverage under one endorsement but not the other, the narrower endorsement (No. 21) should be applied on the ground that it is somehow more "specific" than the other (No. 17). In any event, neither of these two endorsements appears to be more specific than the other. We observe that the insurers cite no authority supporting their position that an endorsement to an insurance policy that would otherwise afford additional insured coverage should not be applied where such coverage would not be afforded under a different, more specific endorsement to the same policy. The insurers' position on this issue appears, at a minimum, to be in tension with the well-established principle that "any ambiguity [in an insurance policy] must be construed in favor of the insured and against the insurer" (White v Continental Cas. Co., 9 NY3d 264, 267 [2007]). As previously noted, Endorsement No. 75, which specifically names the Port Authority as an additional insured, does not apply because it did not go into effect until after the subject accident.

Footnote 13:Apart from the liability verdict adverse to the Port Authority in the underlying actions, the only evidence contained in the present record concerning the causation of the accident is a handwritten, one-page statement by Christian Preuss, an employee of Metro, which document the Port Authority submitted in support of its cross motion for summary judgment. In his statement, Preuss attributed the water discharge to a "zone valve being left (malfunction) in the open position," but did not address how that state of affairs had come about, or which organization had control of the valve. Accordingly, the Preuss statement not only fails to prove that the loss arose from the operations of Brickman Group or its subcontractor, it fails even to raise an issue of fact in that regard. It bears mention that, although the underlying actions were litigated for about eight years before the liability verdict was rendered, the Preuss statement is the only piece of evidence concerning the causation of the accident that the Port Authority submitted in this action in support of its position that its liability in the underlying actions arose from Brickman Group's operations.

Footnote 14:This Court has observed that the difference between a duty to defend and a duty to pay defense costs is "who chooses and pays the defense attorney" (Federal Ins. Co. v Kozlowski [hereinafter, Kozlowski], 18 AD3d 33, 41 n 10 [1st Dept 2005]; see also Liberty Mut. Ins. Co. v Pella Corp. [hereinafter, Pella], 650 F3d 1161, 1172 [8th Cir 2011] [a duty to defend, unlike a duty to pay defense costs, "necessarily requires the insurer to . . . conduct and take control of the whole defense"]; In re WorldCom, Inc. Sec. Litig., 354 F Supp 2d 455, 464 n 11 [SD NY 2005] ["In contrast to a duty to pay defense costs, the duty to defend customarily includes an insurer's right to choose the attorney and to control the litigation strategy"]).

Footnote 15:Although the Port Authority (as previously noted) no longer seeks to require ACE to assume its defense, we observe that the policy's above-quoted express conferral upon ACE of "the right and opportunity to assume from the insured the defense and control of any claim or suit" (emphasis added; internal quotation marks omitted), without mention of any duty on ACE's part to undertake the insured's defense, necessarily implies that ACE has no duty to defend (see Topliffe v US Art Co., Inc., 40 AD3d 967, 970 [2d Dept 2007] ["Pursuant to the language of the policy, (the insurer) had the option to defend, not the duty to defend"]; see also Quadrant Structured Prods. Co., Ltd. v Vertin, 23 NY3d 549, 560 [2014] [noting that "(t)he maxim expressio unius est exclusion alterius" applies to "the interpretation of contracts"]; Salerno v Coach, Inc., 144 AD3d 449, 450 [1st Dept 2016] [same]; Matter of New York City Asbestos Litig., 41 AD3d 299, 302 [1st Dept 2007] [same]). In addition, the insuring agreement of the ACE policy expressly excludes any "obligation . . . to . . perform acts or services" that is not "explicitly provided for" under the referenced heading.

Footnote 16:The reason the duty to defend is often replaced by a duty to reimburse defense costs in insurance policies that provide for a substantial self-insured retention (such as the $500,000 "retained limit" under Brickman Group's ACE policy) has been explained as follows: "By using the obligation to pay claim expenses instead of the duty to defend, the insurers avoid having to pay defense costs on smaller cases where the defense costs do not exceed the self-insured retention. . . . The applicability of the self-insured retention saves money for the insurer on small cases, and in exchange the policyholder maintains greater control over the litigation (and hopefully receives a lower premium)" (Jeffrey E. Thomas, The Scope of the Obligation to Pay Claim Expenses, New Appleman on Insurance: Current Critical Issues in Insurance Law [Nov. 2006]). While the Port Authority is not the policyholder in this case, to the extent it has the status of an additional insured, it holds the same rights as does the policyholder (see BP A.C. Corp. v One Beacon Ins. Group, 8 NY3d 708, 715 [2007] [an additional insured "enjoy(s) the same protection as the named insured"] [internal quotation marks omitted]).

Footnote 17:In determining that the Port Authority is not entitled to reimbursement of defense costs, Supreme Court relied on the underlying policy form without considering the attached Endorsement No. 29, which amends the policy to cover "loss adjustment expense."

Footnote 18:Cf. Pella, 650 F3d at 1171 [under a policy providing for reimbursement of attorneys' fees incurred by the insured "for claims in suit," and defining the term "suit" to mean an action in which covered property damage is "alleged," the insured was entitled to have the insurer "reimburse (its) attorneys' fees for claims in a suit in which covered property damage' is alleged"] [internal quotation marks omitted]).

Footnote 19:Although the Port Authority's complaint seeks, in addition to declaratory relief, an award of its defense costs in the underlying actions, the amount of the defense costs that the Port Authority is entitled to recover from the insurers cannot be determined on the existing record. We therefore remand this matter for further proceedings to make such a determination.

Footnote 20:We note that, unlike the ACE commercial general liability policy at issue here, the directors and officers liability policies at issue in Kozlowski and Westpoint entitled the insurer to recoup the amounts advanced to defend claims ultimately determined not to be covered (see Westpoint, 71 AD3d at 563; Kozlowski, 18 AD3d 41-42; see also National Union Fire Ins. Co. of Pittsburgh, PA v Ambassador Group, Inc., 157 AD2d 293, 299 [1st Dept 1990] [where a directors and officers liability policy required the insurer to reimburse the insured's defense costs but not to provide a defense, any advances of the insured's defense costs would be "subject to recoupment in the event it is ultimately determined no coverage was afforded" and also "subject to apportionment between covered and noncovered claims and parties"). To reiterate, nothing in the ACE policy suggests that the insurer may avoid bearing the cost of defending noncovered claims asserted alongside covered claims in a "suit" as defined by the policy.

Footnote 21:Notably, in BP A.C. Corp., the Court of Appeals specifically rejected the contention that, where there is a duty to defend, an additional insured should not be entitled to a defense until it has been determined whether the loss was within the scope of the additional insured coverage (see 8 NY3d at 714-715). In this regard, the Court stated: "[T]he standard for determining whether an additional . . . insured is entitled to a defense is the same standard that is used to determine if a named insured is entitled to a defense" (id. at 715). This principle — that an additional insured "enjoy[s] the same protection as the named insured" (id. at 715 [internal quotation marks omitted]) — is equally applicable to an insurer's duty to reimburse defense costs.

Footnote 22:We note that, once the $500,000 "retained limit" under the ACE policy was exhausted, nothing in the policy required the Port Authority to wait to press its claim for reimbursement of its defense costs until after its liability had been adjudicated.